## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ELLEN MURPHY and THOMAS, MURPHY,<br>　　　　　Plaintiffs,<br><br>　　　　v.<br><br>WOODLOCH PINES, WOODLOCH PINES, INC., WOODLOCH RESORT, WOODLOCH BUILDERS, ICE RINK ENGINEERING AND MANUFACTURING, LLC AND MULTIPLEX SYSTEMS, INC.,<br><br>　　　　Defendants. | NO. 3:20-CV-00320<br><br><br>(SAPORITO, M.J.) |

## MEMORANDUM

This matter is before the court on the motion for summary judgment (Doc. 53) filed by the defendants Woodloch Pines, Woodloch Pines, Inc., Woodloch Resort, Woodloch Builders (collectively "Woodloch").[1]   The parties have consented to proceed before the undersigned pursuant to 28 U.S.C. § 636(c).  The plaintiffs, Ellen Murphy and Thomas Murphy, initiated this action on February 21, 2020, seeking

---

[1]　The remaining defendants, Ice Rink Engineering and Manufacturing, LLC and Multiplex Systems, Inc., and third-party defendant, Vycom Corp., were voluntarily dismissed without prejudice. (Doc. 50; Doc. 52).

damages for a fall by Mrs. Murphy upon Woodloch's synthetic ice-skating rink on April 8, 2018.

Woodloch asserts that the defendants are entitled to summary judgment on four aspects of this case. First, Woodloch argues that the "no-duty" rule under Pennsylvania law precludes recovery by the plaintiffs because Woodloch had no duty to Mrs. Murphy while she was on the ice rink because of the known or obvious hazards associated with ice skating rinks. Second, the Woodloch defendants contend they are entitled to summary judgment under the doctrine of the assumption of the risk. Third, they argue that Mrs. Murphy extinguished any claim by her express waiver of liability by signing Woodloch's "contract." Finally, Woodloch contends that Mr. Murphy's derivative claim for loss of consortium fails because Mrs. Murphy's claim does not stand, and alternatively, if Mrs. Murphy's claim survives summary judgment, Mr. Murphy has failed to present sufficient evidence to support his claim for loss of consortium.

In opposition to the motion, the Murphys argue that Mrs. Murphy never saw the rut which caused her to fall and never skated on a synthetic ice rink before this incident, so she could not assume the risk

of ice skating.  They also contend the waiver is unenforceable because it was a "receipt" for a skate rental and not a contract, she never saw the language of the alleged release, and no one from Woodloch advised her of the alleged release.

The parties have briefed the motion, and Woodloch docketed a statement of material facts which was answered by the plaintiffs making the motion ripe for disposition.  (Doc. 53-4; Doc. 54; Doc. 55-5; Doc. 54-2; Doc. 55).  For the reasons that follow, we will deny the motion.

## I.    *Statement of Material Facts*

In April 2018, the Murphys vacationed at Woodloch Lodge.   On April 8, 2018, the Murphys decided to ice skate on Woodloch's synthetic ice rink.  While Mrs. Murphy is an experienced ice skater, as she has skated at least twenty-five times before this event, she had never ice skated on synthetic ice.  Prior to skating, on the date of the incident, Mrs. Murphy signed a document evidencing that she charged $5.00 to her room for <u>one</u> skate rental.[2]   Below Mrs. Murphy's signature, on the document, the following appeared:

---

[2]     Although the document evidences only one skate rental, it is undisputed that Mrs. Murphy's husband and their two children were also

> In consideration of the use of the Glice Rink at
> Woodloch and rental equipment:  I agree to keep
> all equipment on Woodloch Property at all times;
> to pay all rental fees, including state and local
> taxes; and to return all equipment in the same
> condition as it was received in.  I agree to pay all
> charges incidental to all breakages, shortages, or
> damage, other than ordinary wear, to said
> property;   FURTHERMORE,   my   signature
> indicates that I have read and understand the
> terms of this agreement and I knowingly and
> voluntarily agree to assume the inherent risk
> involved in ice skating and all sports related
> thereto.  I further agree to hold harmless, release,
> defend, and indemnify Woodloch Pines, Inc. its
> subsidiaries, affiliates, officers, directors, agents,
> and employees from and against all actions, costs,
> claims, losses, expenses, and damages which arise
> from or relate in any way to my use of the Glice
> Rink at Woodloch, and/or rented equipment.

(Doc. 53-3, at 74).[3]

Mrs. Murphy did not read the quoted portion below her signature.

In addition, no one from Woodloch brought it to her attention.  Woodloch's

---

skating at the same time.  (Doc. 53-4 ¶¶ 12, 13, 16; Doc. 54-2 ¶¶ 12, 13, 16).

[3]    Apparently, Mr. Murphy and the plaintiffs' children were permitted to skate on the rink without signing such a statement, even though the receipt indicates that only one skate rental was "sold" to "Murphy, Thomas & Ellen."  (Doc. 53-3, at 74).  Nonetheless, Mr. Murphy rented skates for himself and his two children, but he has no recollection whether he signed an exculpatory clause, nor was one presented to him containing *his* signature during his deposition. (Mr. Murphy Dep. 11-12, Doc. 53-3, at 94).

risk manager, Theodore Malakin, testified at his deposition that when a patron rents skates, the patron provides the size and type of skate, and the skates are then provided to the patron. (Malakin Dep. 70, Doc. 54-3, at 72). Mr. Malakin further testified that, to his knowledge, no one from Woodloch informs the patron that by renting skates the patron waives the right to sue if anything happens to them while on Woodloch's premises. (*Id*.).

Before she began skating on April 8, 2018, Mrs. Murphy noticed that the rink appeared dirty and "that there were ruts and divots all over the place." (Mrs. Murphy Dep. 23, Doc. 53-3, at 32). She also maintained that she did not see the divots before she was on the ice. (*Id*. at 86, Doc. 53-3, at 48). She skated on the synthetic ice surface for ten to fifteen minutes before she fell, but she was unable to glide smoothly over the surface. At some point, Mrs. Murphy observed her children and her husband having difficulty skating on the rink and she also saw her children using an assistive device to skate. Mrs. Murphy did not think to get off the surface despite her difficulty with skating on the rink. She wanted to let her children experience what was available to them. While skating, she stopped and photographed her family with her cell phone. After she took

the photographs, Mrs. Murphy moved her body, and her skate became stuck in a divot causing her to fall.  As a result, Mrs. Murphy sustained an injury to her elbow which required surgical repair and physical therapy.

Mr. Murphy assisted his wife with her basic everyday activities post-surgery because of her limitations.  Her injuries limited the physical sporting events in which the plaintiffs previously participated.  Mr. Murphy testified that their relationship was made stronger because of the help he provided to his wife.  The injury impacted the couple's intimacy during her recovery which was for a period of seven months.

## II.    *Legal Standard*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all

inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52. Thus, in evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that *prima facie* showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a *form* which is inadmissible at trial, the *content* of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

## III.   Discussion

This case is before the Court as a diversity of citizenship action under 28 U.S.C. § 1332.  The plaintiffs are citizens of New York, the Woodloch defendants are Pennsylvania corporations or entities with a principal place of business in the Commonwealth of Pennsylvania, and

the amount in controversy is alleged to be over $75,000.  Thus, diversity jurisdiction is proper.  As this is a diversity action and Pennsylvania was the situs of the injury, the *Erie* doctrine instructs that we apply Pennsylvania law to the facts of this case.  *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938).

### a. The No-Duty Rule and the Assumption of the Risk

Despite Mrs. Murphy's status as a business invitee, Woodloch maintains that it owed her *no duty* to protect her against a known or obvious hazard, and she observed the rink before and during skating and voluntarily assumed the risks incidental to ice skating.  The plaintiffs posit that Woodloch, the possessor of land, owed the plaintiffs a duty to protect them from foreseeable harm, and whether Mrs. Murphy knew of the risks and appreciated their magnitude are questions for the factfinder precluding summary judgment.

### 1. The "no-duty rule"

The no-duty rule provides that a defendant owes no duty of care to warn, protect, or insure against risks which are "common, frequent and expected" and "inherent" in an activity.  *Jones v. Three Rivers Mgmt. Corp.,* 394 A.2d 546, 551 (Pa. 1978); *Craig v. Amateur Softball Ass'n of*

*Am.*, 951 A.2d 372 (Pa. Super. Ct. 2008) (amateur softball player, who was hit in the head while not wearing a helmet, was owed no duty to recommend or mandate that he wear a helmet).  If it is determined the no-duty rule is applicable to a negligence claim, a plaintiff will be unable to set forth a *prima facie* case of liability.  *Id.* at 376.  The "no-duty" concept involves a finding that the defendant had no duty to the plaintiff and, therefore, was not negligent. The defendant is not liable regardless of whether defendant could successfully raise the assumption of the risk defense.  *Berman v. Radnor Rolls, Inc.*, 542 A.2d 525, 531 (Pa. Super. Ct. 1988).  In discussing the liability of an operator of an amusement facility, the Pennsylvania Superior Court observed:

> Although an operator of an amusement facility for which admission is charged is not an insurer of his patrons, he will be "liable for injuries to his patrons . . . where he fails to use reasonable care in the construction, maintenance, and management of [the facility], *having regard to the character of the exhibitions given and the customary conduct of the patrons invited.*" Thus, it is clear that the central inquiry with respect to whether the "no-duty" rule will apply to a given situation, thereby barring recovery, is whether the injury resulted from a risk which is inherent in the amusement activity.

*Telega v. Security Bureau, Inc.*, 719 A.2d 372, 376 (Pa. Super. Ct. 1998 (citations omitted)).

Therefore, the question before this Court is whether a first-time user of a synthetic ice-skating rink will be held to assume as inherent in the activity of ice skating the risk of her skate becoming stuck in a rut or divot causing her to fall and injure herself.  It goes without in-depth analysis that falling while ice-skating is an inherent risk regardless of the nature of the rink and whether imperfections or inequalities exist on its surface. Even the most skillful ice-skaters fall from time-to-time on a level ice surface.  Woodloch's contention, however, is an attempt improperly to shift the focus of the "no-duty" inquiry from the risks inherent in the activity of ice-skating itself to an examination of other risks which may be present on a particular skating rink.

Our analysis is guided by *Oberheim v. Pennsylvania Sports & Enterprises*, 55 A.2d 766 (Pa. 1947).  There, the operator of an ice-skating rink was found negligent in permitting an irregular ice pocket or ridge to exist in the entrance way of the rink by a congealed pile of ice scrapings and litter where the plaintiff fell and injured herself.  The Court held that the operator of the rink "was under a legal duty to keep the premises in a

reasonably safe and suitable condition so that those coming upon them at the [rink operator's] invitation, express or implied, would not be unnecessarily or unreasonably exposed to danger." *Id.*, 55 A.2d at 768. However, the Court observed that the actionable negligence did "not arise from any condition of the skating area of the rink." *Id.* Nonetheless, the Superior Court of Pennsylvania, relying upon *Oberheim*, in an ice-skating accident *within the rink itself,* where an experienced skater fell after he struck a "soft spot" in the ice injuring himself, held that whether the owner negligently permitted a soft spot in the skating rink was a jury question. *See Dean v. Cty. of Allegheny*, 228 A.2d 40 (Pa. Super. Ct. 1967). Interestingly, the *Dean* court noted that there was no barrier or warning concerning the alleged defect in the ice. *Id.* at 41.

Therefore, we find that upon the state of the record before us, the "no-duty" rule does not bar the plaintiffs' action.

### 2. Assumption of the risk

Next, Woodloch argues that Mrs. Murphy voluntarily assumed the risk of injury and is therefore barred from recovery. In the same situation in *Oberheim*, the Court observed that "[I]t will be readily conceded that an invitee of an ice skating rink assumes the ordinary risks incidental to

12

the sport, such as the risk of injury from falling because of imperfections

and inequalities on the surface of the ice reasonably to be anticipated." 55

A.2d at 769.  Here, we are presented with conflicting facts as elicited from

Mrs. Murphy in her deposition.  For example, she testified as follows:

> Q.    When you stepped on the rink,
> did you notice anything about the rink?
>
> * * *
>
> THE  WITNESS:    Before  I  even
> proceeded with skating, I did notice that to me it
> looked dirty and not cared for.
>
> Q.    I would like you to describe it a
> little bit more.  What about it was dirty, did you
> notice any debris or dirt?
>
> A.  No.  In other words, there seems to
> be dirt that was embedded all over the surface
> and I don't know if you want me to continue with
> that.  *I did see that there were ruts and divots
> all over the place*.  So I surmised that this was
> dirt that had been embedded into these ruts and
> divots.  I don't know if it was leaves.  I don't know
> what the dirt was from, but that's what I noticed.
>
> Q.    *Did you notice this before you
> started skating?*
>
> A.    *I did.*  I thought it looked dirty.
> I didn't realize it until after I was there why it
> looked dirty, but it – that was my first impression
> that it looked dirty.
> * * *

>      Q.    Explain a little bit more when
> you say I did the best that I could, what does that
> mean?
>
>      A.    ***Well, it was not easy to skate
> over the divots and ruts.  It was not the same
> experience as regular.***   I was trying to
> maneuver the new to me plastic surface.

(Mrs. Murphy Dep. 22-23, Doc. 53-3, at 32 (emphasis added).  Later in her

deposition, she testified as follows:

>      Q.    When you fell, did you look
> around you to see what the surface looked like?
>
>      A.    Yes, and there was multiple
> divots ***like I said***, but there was one that I'm sure
> that caught my skate.  It was right there.
>
>                    * * *
>
>      Q.    Do you recall how your skate got
> caught on the divot, like what part of your skate?
>
>      A.    I didn't see the divot before I fell,
> otherwise I would have probably avoided it.  I saw
> it after I fell when I was down . . . .
>
>                    ** *
>
>      Q.    Other than the divot that you fell
> in did you notice any other divots on the ice?
>
>      A.    Yes, I did.
>
>      Q.    Did you notice them ***before*** you
> got on the ice?

A.    I'm sorry?

Q.    Did you notice the divots **before** you got on the ice?

A.    **No.**

Q.    **It sounds like you noticed them after your incident, correct?**

A.    **After my incident,** I saw with reasonable certainty that there was a lot of divots around the rink, **yes**.  I got a closer look for sure. I was on the floor, ground or ice or whatever.

\* \* \*

Q.    When you went on the ice, you knew there were divots and you knew there was dirt or some other kind of debris embedded in the ice.

A.    Yes.

(*Id*.  at 26, 85, 86, 88, (emphasis added) Doc. 53-3, at 33, 47-48). This testimony is inconsistent, and at the very least it is unclear to the court. It is not the kind of testimony based on which we are prepared to declare, as a matter of law, that Mrs. Murphy assumed the risk of her injury. Rather, based upon the state of the record before us, whether Mrs. Murphy exercised due care in attempting to avoid the ruts and divots and

remaining on the ice when she may have known of them is a question for the jury.

### b. The Exculpatory Clause

Here, Woodloch argues that the waiver signed by Mrs. Murphy extinguishes any claim she may have while skating on the rink. The plaintiffs contend that there was no contract to enforce because the receipt is not a contract.

The general standards governing such exculpatory clauses have been summarized by the Pennsylvania Supreme Court as follows:

> It is generally accepted that an exculpatory clause is valid where three conditions are met. First, the clause must not contravene public policy. Secondly, the contract must be between persons relating entirely to their own private affairs and thirdly, each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion . . . [O]nce an exculpatory clause is determined to be valid, it will, nevertheless, still be unenforceable unless the language of the parties is clear that a person is being relieved of liability for his own acts of negligence. In interpreting such clauses we listed as guiding standards that: 1) the contract language must be construed strictly, since exculpatory language is not favored by the law; 2) the contract must state the intention of the parties with the greatest particularity, beyond doubt by express stipulation, and no inference from words of general import can establish the intent of the

> parties; 3) the language of the contract must be construed, in cases of ambiguity, against the party seeking immunity from liability; and 4) the burden of establishing the immunity is upon the party invoking protection under the clause.

*Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1189 (Pa. 2010) (citations omitted).

In support of the motion, Woodloch contends that the facts fall squarely within the standards for the enforcement of an exculpatory clause. In opposition to the motion, the plaintiffs argue that this issue is governed by *Beck-Hummel v. Ski Shawnee, Inc.*, 902 A.2d 1266 (Pa. Super. Ct. 2006), because the exculpatory clause was unread (despite it being undisputed that Mrs. Murphy signed the document), and it was inconspicuous, as its placement, font size, and lack of appropriate highlights or bold print did not bring it to Mrs. Murphy's attention. (Doc. 54, at 12-13). Also, in *Beck-Hummel*, we note that the plaintiffs there did *not* contest the enforceability of the release, which is contrary to the plaintiffs' assertion that the receipt did not constitute a contract.[4] The

---

[4] The plaintiffs in *Beck-Hummel* also contested whether the language of the disclaimer encompassed their claims, but the court never reached that issue. *Id.* at 1269 n.2.

court in *Beck-Hummel* stated the issue as "whether [the release] is enforceable against the Hummels under the circumstances of this case, including whether it was sufficiently conspicuous." *Id* at 1269-70.

Here, the release language appeared on the same side of the paper and below Mrs. Murphy's signature. But, before the release language, and after her signature, the document stated that Mrs. Murphy agreed to keep the equipment on Woodloch's property, to pay all rental fees, including state and local taxes, to pay for any damage to the equipment, and to return the equipment in the same condition as it was received other than ordinary wear to the property. The release language was not set out separately; it did not contain a different font size except and *only* for the word "FURTHERMORE" which was before the start of the release; and it was not highlighted or in bold print. We recognize that under Pennsylvania law, conspicuity of language is not essential to contract formation. *Hinkal v. Pardoe*, 133 A.3d 738, 745 (Pa. Super. Ct. 2016). "Nonetheless, in cases where the existence of a contract, or a meeting of the minds, cannot be determined as a matter of law, conspicuity has been resorted to as a means of proving the existence or lack of a contract." *Id.*

In *Beck-Hummel*, the release language appeared on the back side of an *unsigned* tubing ticket, the plaintiff never read the exculpatory language, she was never told by anyone to read it, and there was no sign telling her to do so.  There, the court was guided by Section 496B of the Restatement (Second) of Torts which provides:

> A plaintiff who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy.

Also, the *Beck-Hummel* court relied upon comment d to Section 496B, which states:

> In order for an express agreement assuming the risk to be effective, it must appear that the plaintiff has given his assent to the terms of the agreement. Particularly where the agreement is drawn by the defendant, and the plaintiff's conduct with respect to it is merely that of a recipient, it must appear that the terms were in fact brought home to him and understood by him, before it can be found that he has accepted them.

*Id.* at 1273-74.  We are familiar with the law of Pennsylvania, which holds that "[o]ne who is about to sign a contract has a duty to read that contract first." *Schillachi v. Flying Dutchman Motorcycle Club,* 751 F. Supp. 1169, 1174 (E.D. Pa. 1990) (citations

omitted).   Woodloch directs our attention to *Hinkal*, which supports this well-settled legal precedent. *Hinkel*, 133 A.3d at 743. However, in *Hinkal* and unlike our facts, the membership agreement contained an *unambiguous* directive *not to sign* the agreement until reading both sides, a clear pronouncement that the terms on both sides of the form were part of the agreement, and a straightforward statement that the agreement constituted the entire agreement between the parties.

Under the circumstances of this case, where it is disputed whether Mrs. Murphy read the exculpatory language despite her signature, it is undisputed that no one specifically brought her attention to it, the document itself was not instructive that she should *not* sign the document unless she first read it, and it is not so conspicuous as to place her on notice, we cannot conclude, as a matter of law, that the exculpatory language is enforceable. Further, the receipt here did not require an express acknowledgment that its terms were read and accepted before using the facility and nothing about the receipt ensured that a

purchaser would be aware of its release provision.[5]   As in *Beck-Hummel*, where the resolution of this issue was dependent upon whether there was a meeting of the minds to establish the existence of a contract, we find that there are genuine issues of material fact which preclude the entry of summary judgment on this issue.   Therefore, we will leave this issue of fact for the factfinder's determination.

Woodloch concedes that the waiver does not protect against allegedly reckless conduct by Woodloch.  (Doc. 55, at 11).  However, the Woodloch defendants maintain that the evidence does not rise to the level of recklessness and therefore, its motion should be granted to that extent. In their complaint, the plaintiffs have alleged reckless conduct by Woodloch and we decline the invitation to declare, as a matter of law, that the evidence submitted in support of the motion does not rise to recklessness.   Although rather thin, the plaintiffs present evidence from

---

[5]   Although Mr. Murphy's name appeared on the "receipt" or "contract," he did not sign the document and it is unclear whether he was made aware of the exculpatory clause. Regardless, Woodloch has not relied upon the exculpatory clause to avoid liability as to Mr. Murphy's loss of consortium claim, but rather it asserts that, as a derivative claim, if his wife's claim fails, so does his.

which a jury might reasonably infer recklessness.  Thus, we will leave that matter for the jury.

### c. Mr. Murphy's loss of consortium claim

Woodloch's position that Mr. Murphy's derivative claim for loss of consortium is unsustainable based upon the evidence in the record is meritless.  Mr. Murphy assisted his wife with her basic everyday activities post-surgery because of her limitations.  Her injuries limited the physical sporting events in which the plaintiffs previously participated.  Mr. Murphy testified that their relationship was made stronger because of the help he provided to his wife.  The injury impacted the couple's intimacy during her recovery which was for a period of seven months.

Therefore, we will deny the Woodloch defendants' motion for summary judgment.

An appropriate order follows.

<u>**s/Joseph F. Saporito, Jr.**</u>
JOSEPH F. SAPORITO, JR.
United States Magistrate Judge

Dated:  November 21, 2022